**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BERNARD L. MALONEY AND NATHAN SEVERE, Individually and On Behalf of All Others Similarly Situated,

Lead Plaintiffs,

v.

OLLIE'S BARGAIN OUTLET HOLDINGS, INC., MARK BUTLER, JAY STASZ, and JOHN SWYGERT,

Defendants.

No. 1:19-cv-08647-JPO

JURY TRIAL DEMANDED

# FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS

**Page**


NATURE OF THE ACTION ........................................................ 1

JURISDICTION AND VENUE ........................................................ 8

PARTIES ........................................................ 9

I. SUBSTANTIVE ALLEGATIONS ........................................................ 10

A. Background ........................................................ 10

B. Ollie's Aggressive Expansion ........................................................ 11

C. Ollie's Comparable Store Sales Was the Key Financial Metric Followed by Investors and Analysts ........................................................ 12

D. Defendants Knew That Ollie's Was Suffering from Significant Supply Chain Issues and a Glut of Low-Margin Inventory as of 1Q 2019 ........................................................ 13

E. Defendants' Materially False and Misleading Statements ........................................................ 19

1. The March 26, 2019 Misstatements and Omissions ........................................................ 19

2. The June 6, 2019 Misstatements and Omissions ........................................................ 21

F. Ollie's Discloses that Significant Inventory Supply Chain Issues and a Low- Margin Inventory Mix Caused Comparable Store Sales to Decline for the First Time in Five Years ........................................................ 26

G. Additional Allegations Regarding Materiality ........................................................ 29

H. Additional Scienter/Falsity Allegations ........................................................ 32

I. Presumption of Reliance: Fraud on the Market ........................................................ 35

J. Loss Causation / Economic Loss ........................................................ 36

II. CLASS ACTION ALLEGATIONS ........................................................ 38

CAUSES OF ACTION ........................................................ 40

COUNT I - Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against all Defendants ........................................................ 40

COUNT II - Violation of Section 20(a) of the Exchange Act Against the Individual Defendants ....................................................................42

PRAYER FOR RELIEF ..................................................................................................43

JURY TRIAL DEMANDED..........................................................................................45

Lead Plaintiffs Nathan Severe and Bernard L. Maloney, III ("Lead Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge. Lead Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation, review and analysis of filings with the United States Securities and Exchange Commission ("SEC"), press releases, news articles, analyst reports, and interviews with former Ollie's Bargain Outlet Holdings, Inc. ("Ollie's" or the "Company") employees. Lead Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a class action on behalf of persons and entities (the "Class") that purchased or otherwise acquired Ollie's securities between March 26, 2019 and August 28, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Ollie's is a bargain retailer of closeout merchandise and excess inventory. The Company was founded in 1982 and is headquartered in Harrisburg, PA.

3. Since Ollie's initial public offering in 2015, the Company has embarked on an aggressive expansion campaign, growing from just 176 stores in 2014 to 324 stores in 25 states in 2019.

4. Ollie's has historically outpaced its competitors year-over-year – reporting 19 consecutive quarters of comparable store sales growth as of 4Q2018. Ollie's comparable store sales growth metric was critical to investors and analysts, who were concerned that Ollie's aggressive expansion efforts would negatively impact existing store sales by creating inventory

problems. However, Ollie's consistently reported comparable store sales growth from 2015 through early 2019, alleviating these concerns.

5. On the first day of the Class Period, March 26, 2019, Defendants issued positive financial results for 4Q2018,[1] reporting an increase in comparable store sales of 5.4% on top of a 4.4% increase in the prior year. Defendants also issued guidance for FY2019, stating that comparable store sales would continue to increase. Specifically, the Company issued the following FY2019 guidance:

- Comparable store sales growth of 1.0% to 2.0%;
- Total net sales of $1.436 billion to $1.449 billion;
- Operating income of $189.0 million to $193.0 million;
- Adjusted net income of $140.0 million to $144.0 million; and
- Adjusted net income per diluted share of $2.10 to $2.15.

6. On a conference call with analysts that same day, Ollie's then-Chief Executive Officer, Defendant Butler, assured investors and analysts that the Company had the necessary inventory to support both its expansion and comparable sales growth, stating that Ollie's was "locked and loaded" with inventory for 2019, that the inventory "pipeline is full," and that the Company's deal flow was so strong that "we can very easily support our expansion efforts."

7. On June 6, 2019, Ollie's posted positive 1Q2019 financial results. In addition to the Company's successful expansion efforts, Ollie's reported its 20th straight quarter of comparable store sales growth, as well as increases in net income, adjusted net income, and adjusted EBITDA.

[1] Ollie's follows a 52/53-week fiscal year. Accordingly, fiscal year 2018 refers to the period of February 4, 2018 to February 2, 2019. The first quarter of Ollie's fiscal year 2019 ended May 4, 2019.

8. As a result of the positive 1Q2019 results, Ollie's reiterated its FY2019 comparable store growth increase of 1.0% to 2.0% and raised its revenues and earnings forecast for FY2019. Specifically, Ollie's FY2019 earnings guidance advised, among other things, that investors should expect:

- Comparable store sales growth of 1.0% to 2.0%;
- Total net sales of $1.440 billion to $1.453 billion;
- Adjusted operating income of $190.0 million to $194.0 million;
- Adjusted net income of $142.0 million to $145.0 million; and
- Adjusted net income per diluted share of $2.13 to $2.17.

9. Defendants also reported a 19.2% increase in 1Q2019 inventory of $329.1 million (compared to $276 million the prior year) and again represented to investors that the Company was "locked and loaded" with seasonal products and that they did not see a slowdown with respect to inventory going into 2Q2019 as they "were appropriately overbought."

10. In addition to raising FY2019 guidance, on a June 6, 2019 call with analysts, Defendants represented that Ollie's expansion efforts were successful, touting the performance of Ollie's new stores and the Company's ability to rapidly expand without sacrificing comparable store sales. Defendants blamed temporary weather issues for the moderately lower growth in comparable store sales during the 1Q2019 as compared to the same quarter in 2018, assuring analysts that the Company would make up the sales in the 2Q2019.

11. On the June 6, 2019 call, Defendants also made representations about Ollie's inventory and the type of inventory Ollie's had ready to roll out to its stores. Specifically, Defendant Butler allayed concerns over whether Ollie's was able to obtain high-margin

inventory, claiming that the Company was "appropriately overbought" and that lower margins were not a concern.

12. Analysts viewed Ollie's favorable guidance, continued comparable sales growth, safe margins, and new store productivity as reasons to invest in the Company. For example, an April 12, 2019 J.P. Morgan report noted that "Mgmt. reiterated its [same store sales] guide of +1-2% growth for FY19 with…2Q/3Q towards the high-end" and reported that "CEO Butler cited <u>strong confidence</u> in" comparable sales growth. (Emphasis in original). Similarly, a June 6, 2019 J.P. Morgan report rated Ollie's "Overweight," stating that the Company was "locked and loaded" with warm weather products. A June 6, 2019 Credit Suisse report rated Ollie's "Outperform," stating "we believe a sizeable white space opportunity and improving real-estate profile (e.g. former Toys "R" Us locations) ***should underscore elevated new store productivity, the key driver of top-line growth***." (Emphasis added). On June 7, 2019 RBC Capital Markets rated Ollie's "sector perform," noting that "management suggested that NSP [new store productivity] will likely be over 100% for 2019." Similarly, a June 6, 2019 KeyBanc Capital markets report rated Ollie's as "overweight," stating that "[m]anagement reiterated its ***comp expectation of 1-2%*** and reaffirmed its enthusiasm for closeout inventory availability." (Emphasis added).

13. Defendants knew, however, that their statements about Ollie's inventory and comparable store sales, as well as the FY2019 guidance, were false and materially misleading because, as reported by several former Ollie's employees, the Company was suffering from significant supply chain inventory issues, as well as a glut of low-margin inventory, since at least 1Q2019.

14. Numerous former Ollie's employees reported that the Company was experiencing supply chain issues and reduced inventory, including reduced high-end inventory, in its stores since 1Q2019 and that these issues were negatively impacting Ollie's revenues and comparable store sales during 1Q2019.

15. For example, CW1,[2] a former district manager of over a dozen Ollie's stores from September 2015 to April 2019, reported that by the end of 2018, Ollie's began suffering from significant inventory issues. Specifically, CW1 reported that during the first years of CW1's tenure at Ollie's, stores opened with $1.5 to $1.7 million in inventory – but as of 1Q2019, opening inventory ***had shrunk by 25%*** to $1.2 million. As a result of the reduction in inventory, Ollie's had to move inventory from existing stores to new stores so that the new stores could be fully stocked. CW1 also reported that Ollie's was plagued by lower-quality inventory beginning in 1Q2019.

16. Another former Ollie's employee, CW3, who was an Assistant Store Opening Coordinator for Ollie's from August 2018 to December 2019, corroborated the reduction in inventory, reporting that beginning in November 2018, problems getting inventory where it needed to go became evident. Like CW1, CW3 stated that Ollie's stores were supposed to open at $1.7 million in inventory but going into 2019, the actual amount of inventory that a typical store opened with began to skew significantly lower, dropping to $1.2 million.

17. Another former Ollie's employee, CW2, a former Operations Manager at one of Ollie's Distribution Centers,[3] reported that it was well-known by Ollie's corporate executives that Ollie's Distribution Centers were not efficiently managed, that the Company failed to accurately measure performance at its Distribution Centers using established industry practices, and that the Company lacked an accurate understanding of how long it took to get inventory

---

[2] The confidential witnesses or "CWs" are defined below.

[3] The "Distribution Centers" refers to the centers from which Ollie's sent out goods to the Company's stores. During the Class Period, Ollie's had two Distribution Centers: York, Pennsylvania and Commerce, Georgia.

from the Distribution Centers to the stores. The efficiency of Ollie's Distribution Centers was paramount because goods reached Ollie's stores through these centers. As a result of these inefficiencies, CW2 witnessed inventory bottleneck issues that resulted in CW2's Distribution Center being "perpetually behind" and suffering from constant employee turnover.

18. Defendants knew about the inventory issues and the effect it was having on comparable store sales or, at the very least, had access to information that showed their public statements were not accurate. Ollie's core business is the sale of goods, its main asset is inventory, and according to Ollie's Chief Financial Officer, Defendant Stasz, Ollie's executives reviewed inventory "***on a weekly basis.***" Further, during the Class Period, the Company tracked sales daily in what were called "Daily Flash Reports." According to a former Ollie's employee, these reports (which were transmitted to Ollie's executives daily), showed sales for each of Ollie's stores and illustrated which stores were not making their sales numbers. The Daily Flash reports notified Defendants of comparable store inventory problems because sales and inventory are intimately linked. Similarly, monthly reports during the Class Period showed that comparable sales were decreasing. These reports were available to Ollie's executives and showed daily, monthly and year-to-date sales figures. According to CW1, the reports showed comparable store declines for all stores within CW1's region (which was one of Ollie's three regions nationwide).

19. Therefore, at the time Defendants issued their positive statements regarding Ollie's inventory, the Company's expansion efforts, and the continued growth of Ollie's comparable store sales beginning in March 2019, Defendants knew that Ollie's rapid expansion efforts were negatively impacting comparable store sales, both because supply chain issues that began in 1Q2019 were resulting in a lack of sufficient inventory to fill its new stores, and because less high-end inventory had eaten into comparable store sales and revenues. These issues forced Ollie's existing stores to divert inventory to the Company's new stores.

20. The market learned of the supply chain and inventory issues on August 28, 2019 when the Company slashed its FY2019 guidance due to supply chain issues that Ollie's Chief Operational Officer, Defendant John Swygert, admitted existed "for most--all of Q2." Swygert also admitted that it was not corrected until "the last week of the quarter." According to Swygert, the supply chain issues prevented Ollie's from getting sufficient amounts of inventory into its stores. On the same call, Defendant Butler admitted that the "margin profile of the products that we bought," *i.e.*, lower high-end inventory, also undermined the FY2019 guidance.

21. Because of the inventory supply chain issues and lower-margin inventory, the Company reported a ***decrease in comparable store sales for the first time in five years*** – disclosing to the market for the first time that, contrary to the Company's representations, Ollie's meteoric growth was at the expense of its existing stores. Ollie's comparable store sales decreased 1.7% during 2Q2019, dropping from a 4.4% increase in the prior year.

22. The supply chain issues also caused Ollie's to report decreases in net income, adjusted net income, and adjusted EBITDA for the 2Q2019:

- Net income decreased 15.7% to $25.2 million and net income per diluted share decreased 15.6% to $0.38.
- Adjusted net income decreased 9.9% to $23.5 million and adjusted net income per diluted share decreased 12.5% to $0.35.
- Adjusted EBITDA decreased 6.8% to $37.5 million.

23. As a result of the Company's disappointing results, Defendants lowered their previously issued FY2019 comparable sales growth to a range of 0.5% to 1.5% – down from the previously estimated increase of 1.0% to 2.0%. Defendants also lowered the remaining FY2019 guidance, estimating: total net sales of $1.419 billion to $1.430 billion (a decrease from the $1.440 billion to $1.455 billion previously estimated); operating income of $174 million to $178

million (a decrease from the $190 million to $194 million previously estimated); and adjusted net income of $130 million to $133 million (a decrease from the estimated $142 million to $145 million).

24. On this news, Ollie's shares plummeted $21.41 per share – *almost 30%* – to close at $56.36 per share on August 29, 2019, on unusually high trading volume.

25. Analysts were surprised by the August 28, 2019 disclosures. An August 28, 2019 Wells Fargo Report stated that "OLLI reported a surprising bad quarter, as a litany of internal and external issues resulted in a material earnings disappointment." Similarly, an August 29, 2019 RBC Capital Markets Report stated that "this quarter was a big disappointment. We remain on the sidelines for now." Finally, an August 29, 2019 Quo Vadis Capital Report stated that "we remain sellers of OLLI post 2QFY19" and an August 29, 2019 J.P. Morgan Report lowered its Ollie's price target.

26. The reverse in Ollie's comparable store sales continued in 3Q2019 when it reported a decrease of 1.4% in comparable store sales compared to a 4.6% increase in the prior year.

27. As a direct and proximate result of Defendants' fraud, Ollie's investors lost hundreds of millions of dollars.

## JURISDICTION AND VENUE

28. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

29. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

30. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this judicial district. The Company also has a store in this District.

31. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

32. Lead Plaintiff Nathan Severe, as set forth in the certification submitted with his motion for appointment as lead plaintiff, incorporated by reference herein, purchased Ollie's securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

33. Lead Plaintiff Bernard L. Maloney, III, as set forth in the amended certification attached hereto, purchased Ollie's securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

34. Defendant Ollie's is incorporated under the laws of Delaware with its principal executive offices located in Harrisburg, Pennsylvania. Ollie's common stock trades on the NASDAQ exchange under the symbol "OLLI."

35. Defendant Mark Butler (Butler) was the President, Chief Executive Officer, and Chairman of the Board of Directors of the Company at all relevant times.[4]

---

[4] Defendant Butler passed away on December 1, 2019.

36. Defendant Jay Stasz (Stasz) was the Chief Financial Officer of the Company at all relevant times.

37. Defendant John Swygert (Swygert) was the Chief Operational Officer of the Company at all relevant times.

38. Defendants Butler, Stasz, and Swygert (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## I. SUBSTANTIVE ALLEGATIONS

### A. Background

39. Ollie's is one of the largest retailers of closeout merchandise and excess inventory in the United States. The Company was co-founded by Defendant Butler in 1982 and is headquartered in Harrisburg, PA.

40. Ollie's sells itself as a value retailer of brand name merchandise at reduced prices. Ollie's offers different, constantly evolving assortments of brand name merchandise across a

broad range of categories at reduced prices, augmented by discounted unbranded goods and its own private-label brands.

41. Ollie's stores feature a broad number of categories including food, housewares, books and stationery, bed and bath, floor coverings, electronics and toys as well as other products including hardware, personal health care, candy, clothing, sporting goods, pet and lawn and garden products. Ollie's focuses on "buying cheap to sell cheap."

42. In July 2015, Defendant Butler brought Ollie's public through an initial public offering ("IPO").

B. **Ollie's Aggressive Expansion**

43. Ollie's business model depends on the availability of brand name merchandise and increased sales through expansion. Ollie's historically drove sales and profitability by growing its store base. For example, the Company stated in its March 2019 Form 10-K:

> Our business model has produced consistently strong growth and financial performance. From 2014 through 2018 (except as noted):
>
> - Our store base expanded from 176 stores to 303 stores, a compound annual growth rate, or CAGR, of 14.5% and we entered seven new states;
> - Comparable store sales grew at an average rate of 4.1% per year;
> - Net sales increased from $638.0 million to $1.241 billion, a CAGR of 18.1%; and
> - Net income increased from $26.9 million to $135.0 million.

44. As of February 2018, Ollie's operated 268 stores, averaging approximately 32,500 square feet, across 20 contiguous states in the Eastern portion of the United States, having successfully opened stores in six new states since 2013.

45. In 2019, Ollie's continued its aggressive expansion, opening dozens of new stores and entering the states of Massachusetts and Oklahoma. Twelve of these new stores were former Toys "R" Us locations acquired by Ollie's in the preceding year, with a larger average footprint

than its existing stores. The new Toys "R" Us stores posed supply chain problems, as they were much larger than Ollie's existing stores and needed much more inventory than what Ollie's stores historically needed.

46. During the Class Period, Ollie's operated two distribution facilities. These facilities were located in York, PA and Commerce, GA. These centers were responsible for providing inventory to all of the Company's stores.[5]

### C. Ollie's Comparable Store Sales Was the Key Financial Metric Followed by Investors and Analysts

47. From the Company's IPO through June 2019, Ollie's experienced 20 consecutive quarters of positive comparable store sales.

48. Comparable store sales measured existing stores' sales in the current period against their performance in the corresponding period of the previous year.

49. Comparable store sales performance was critical to investors and analysts as it was the primary measure of whether Ollie's rapid expansion efforts were negatively impacting its existing stores. By reporting comparable store sales growth quarter after quarter, Defendants were able to alleviate these concerns.

50. As a result of Defendants' representations, analysts viewed Ollie's available inventory, expected comparable sales growth, and new store productivity as reasons for investors to invest in the Company. For example, an April 12, 2019 J.P. Morgan report noted that "Mgmt. reiterated its [same store sales] guide of +1-2% growth for FY19 with…2Q/3Q towards the high-end" and cited "CEO Butler['s] <u>strong confidence</u> in" comparable sales growth. (Emphasis in original). Similarly, a June 7, 2019 RBC Capital Markets report stated that "our 2019/2020 EPS estimates are based on…comp growth of 1.5%/2.3%[.]" RBC also noted that "management suggested that NSP [new store productivity] will likely be over 100% for 2019." Similarly, a June 6, 2019 KeyBanc Capital Markets report stated that "[m]anagement reiterated its comp

[5] In 2018, Ollie's also acquired a 58-acre parcel of land in Lancaster, TX for the construction of its third Distribution Center. The 615,000 square foot facility was expected to be operational by the first quarter of 2020.

expectation [comparable stores sales] of 1-2% and reaffirmed its enthusiasm for closeout inventory availability." Likewise, a June 6, 2019 Credit Suisse report stated that "OLLI reiterated its comp sales growth outlook of 1.0% to 2.0 and opening 42 to 44 stores." That report also stated that "we believe a sizeable white space opportunity and improving real-estate profile (e.g. former Toys "R" Us locations) ***should underscore elevated new store productivity***, the key driver of top-line growth." (Emphasis added).

### D. Defendants Knew That Ollie's Was Suffering from Significant Supply Chain Issues and a Glut of Low-Margin Inventory as of 1Q 2019

51. Confidential witnesses report that the "handwriting was on the wall" at Ollie's in early 2019 regarding serious inventory problems, including both supply chain issues and a lower margin inventory mix.

***Confidential Witness No. 1 (CW1)***

52. CW1 worked as a district manager for Ollie's from September 2015 to April 2019. CW1 reported to Director of Stores, Scott Osborne. The reporting structure in CW1's division included Osborne, three Regional Directors, and Senior Vice President of Store Operations, Omar Segura, who reported directly to Defendants Swygert and Butler. As a district manager, CW1 managed between 14 to 16 Ollie's store managers. CW1's responsibilities included supporting the teams in each store he managed and communicating the strategic relevance of corporate initiatives to CW1's staff and executing on corporate strategies. CW1 was responsible for hiring and training staff and identifying opportunities for operational improvement. CW1 was intimately involved with store openings and has first-hand knowledge about Ollie's inventory and store sales within CW1's region.

53. CW1 stated that it was clear in late 2018 and early 2019 that Ollie's stores ***across the country*** were failing to hit their inventory numbers and would continue to do so. CW1 stated that these problems were not new – CW1 had been witnessing lower inventory values in CW1's stores since June 2018.

54. CW1 reported that the lack of inventory was apparent late in 2018 through the

beginning of 2019 because "we were opening stores and the inventory was not coming in." CW1 explained that sales were down for "the last three or four quarters" that CW1 was at the Company due to "lack of adequate inventory." CW1 stated that with inventory values at the stores so much lower than what they had historically been, it was unrealistic to think the stores would have comparable sales similar to previous years.

55. CW1 explained that during the first years of CW1's tenure at Ollie's, CW1 opened stores with $1.5 to $1.7 million in inventory. Towards the end of CW1's tenure, opening inventory ***had shrunk by 25%*** to $1.2 million. CW1 explained that items had to be diverted from existing stores to stock the new stores: "otherwise these stores would've been empty." CW1 also explained that lower margin inventory caused the sharp drop in inventory value.

56. According to CW1, executives at Ollie's, including Butler and Swygert, had electronic access to updated numbers showing Company-wide inventory levels and sales on a daily basis. These daily reports showed sales for each of Ollie's stores and illustrated which stores were not making their sales numbers. Similarly, CW1 stated that monthly reports during the Class Period showed that comparable store sales were decreasing. These reports were available to Ollie's executives and showed daily, monthly and year-to-date sales figures. According to CW1, the reports showed that comparable store sales were declining for all stores within CW1's region (which was one of Ollie's three regions nationwide) during the Class Period.

57. CW1 reported that CW1, along with other Ollie's district managers, were struggling with low-quality inventory in their stores in March 2019 and, as a result, CW1 was not hitting CW1's sales numbers for 1Q2019. CW1 reported that CW1 participated on weekly Monday conference calls with Director of Stores Scott Osborne and other Ollie's district managers, where CW1 heard similar complaints from the other district managers. CW1 stated that these calls occurred after the Company sent out weekly sales reports.

58. CW1 stated that the nose dive that occurred in 1Q2019 was mentioned during some of the weekly conference calls.

59. CW1 stated that Senior Vice President of Store Operations, Omar Segura, attended some of CW1's store grand openings and that Scott Osborne "was always there at the grand opening."

60. CW1 reported that the lack of inventory led to high turnover among store managers concerned about not hitting sales targets necessary to receive their bonuses.

***Confidential Witness No. 2 (CW2)***

61. CW2 worked as an outbound operations manager at Ollie's from October 2017 to March 2019. CW2 was based at Ollie's Distribution Center in Commerce, Georgia. CW2 reported to Operations Manager, Stephen Wolfe, who reported to General Manager of Distribution Mike Scarborough, both of whom were also based in the Ollie's Distribution Center in Commerce, Georgia. As an operations manager, CW2 led and developed a team of over 120 associates. CW2 was responsible for multi-shift outbound operations within a 970,000 square foot Distribution Center, which serviced 151 Ollie's stores. As part of CW2's responsibilities, CW2 hired and trained merchandise handlers to load trucks at the Commerce Distribution Center, implemented productivity enhancements, and engaged in production planning and budget management.

62. CW2 corroborated CW1's report that Ollie's tracks inventory and sales on an ongoing basis and that Ollie's executives have ongoing access to such figures. CW2 also explained that sales numbers are transmitted to Ollie's executives daily. For example, CW2 stated that sales numbers by store were published to all Ollie's managers (and those higher than managers) in what were called Daily Sales Flash Reports, so that everyone, including the executives, could see whether the stores were doing well or poorly. Because sales and inventory are intimately linked, these reports also communicated to Ollie's managers and executives the current state of Ollie's inventory.

63. CW2 reported that Ollie's Distribution Centers were not efficiently managed. For example, Ollie's did not measure performance at its Distribution Centers using established industry practices defined by industrial engineers. CW2 explained that the Company lacked an

accurate understanding of how long it took to complete tasks at the Distribution Centers. CW2 stated that Ollie's executives evaluated performance at the Company's warehouses using a "made up" metric with no basis in reality. The metric purported to assess the "total performance of the merchandise handlers."

64. CW2 reported that Ollie's was not setting performance expectations for the employees in its Distribution Centers and the Company did not have an accurate idea of how much should be accomplished in a certain amount of time by the workers at the Distribution Centers. CW2 explained that "[m]ost Distribution Centers have engineered standards – you're expected to take X time to complete a task; Ollie's standards aren't measured so there's no logical way to track or communicate to people when they don't meet the standard."

65. CW2 witnessed inventory bottlenecks at the Commerce, Georgia Distribution Center during his tenure with Ollie's caused by the Company's failure to have an accurate understanding of how long it took for inventory to be loaded and shipped. For example, CW2 reported that "[t]hey just set a number – let's say, hypothetically, that we need to ship 20K cartons this shift . . . [w]e should know that, according to engineered standards, we have 10 people picking 300 cartons per hour, so it should take X-time long." However, according to CW2, Ollie's never measured how long it took but rather made up numbers that "weren't true standards," which were consistently demonstrated to be inaccurate – "they just made up a number." The failure to accurately measure loading and shipping time resulted in the Distribution Centers being "perpetually behind" because the Distribution Centers "had no chance of shipping out the amount of product on the standard they set," resulting in overworked employees and constant employee turnover.

66. CW2 stated that it was well known within Ollie's, both at CW2's Distribution Center and at corporate headquarters, that the standards were not accurate. "[M]any people in the organization…suggested to have the standard truly measured." "It was suggested to VP of Logistics Jeff Glass, it was suggested to SVP Logistics Ray Daugherty, it was suggested to COO John Swygert, to…Mark Butler. Everybody knew about it, but nobody did anything about it."

67. CW2 stated that Operations Manager Stephen Wolfe and General Manager of Distribution Mike Scarborough were alerting the team at corporate to these problems.

68. As the outbound operations manager of the Commerce, Georgia Distribution Center, CW2 was responsible for the picking department, which was responsible for handling merchandise. CW2 knew that the standards were skewed because no one in CW2's workforce could ever come close to achieving the target output. "I was responsible for meeting expectations that were not accurate," CW2 said. "The expectations were not reasonable; they were not realistic."

69. CW2 said that CW2 looked at the actual versus target output and said, "wow, these aren't close." CW2 spoke with CW2's superiors, and they spoke with their superiors, about the problem many times over CW2's 16-month tenure. "Everyone acknowledged [the standards] were inaccurate."

70. CW2 said that it was frustrating for the merchandise handlers (pickers) because they could not earn their bonuses by meeting and exceeding the impossible standard.

71. CW2 stated that Defendant Swygert was hands-on with respect to the Company's finances, inventory control, and all other aspects of the operations. CW2 reported that no decision was made at Ollie's without Swygert's involvement. For instance, CW2 explained that each picker at CW2's Distribution Center was eligible for a 25 cent raise annually. "If someone on annual review got anything above a 25 cent increase, the approval chain ended up with John," CW2 stated. "He was involved in anything that happened – everything goes through him."

72. CW2 stressed that Swygert's involvement in matters big and small far exceeded micromanagement. CW2 stated that Swygert was practically the CEO of the Company, yet he was involved in the minutiae of day-to-day business at the Distribution Centers, and across the Company. For example, CW2 stated that Swygert was so involved with every detail of the Company that he witnessed him personally resolving inventory discrepancies at CW2's Distribution Center with Inventory Control Manager Adam Morgan.

***Confidential Witness No. 3 (CW3)***

73. CW3 started working for Ollie's in May 2017 as a store opening specialist. From August 2018 through December 2019, CW3 worked as an assistant store opening coordinator for the Company. CW3 was responsible for setting up and opening new stores as part of Ollie's expansion. CW3 guided store opening coordinators as they worked with new hires and worked to get each store set up for grand openings. CW3 was responsible for all aspects of new store openings, including handling all aspects of merchandising, store layout, labor costs, and financial results.

74. CW3 stated that beginning in November 2018, problems getting freight where it needed to go became evident. CW3 was aware of this first-hand.

75. CW3 explained that Ollie's had always had distribution shortcomings, but the problems became more pronounced going into 2019, as Ollie's rate of growth escalated and the Company began opening too many stores at once. CW3 stated that the rush to fill the 12 Toys "R" Us stores that the Company had purchased contributed to the problem.

76. CW3 stated that Ollie's stores were supposed to open with $1.7 million in inventory. But going into 2019, the actual amount of inventory that a typical store opened with began to skew significantly lower, dropping to $1.2 million in some instances.

77. This corroborates CW1's statement that inventory at Ollie's stores had dropped to $1.2 million in early 2019. *See* ¶ 55.

78. CW3 explained that CW3 was aware of opening inventory at Ollie's stores because CW3 participated in weekly conference calls every Tuesday with "all the people opening stores," and they would discuss opening inventory levels.

79. CW3 stated that early in 2019 it became clear from the calls that the Company was struggling to meet its inventory goals for the new store openings.

80. CW3 stated that Senior Vice President of Store Operations, Omar Segura, Senior Director of New Store Development, Brian Shipley, and all the Store Opening Coordinators and other opening staff participated in the calls. According to CW3, during the calls it was discussed

that the inventory shortages were "all tied to issues at the Distribution Centers."

***Confidential Witness No. 4 (CW4)***

81. CW4 worked as an Ollie's store team leader from April 2017 to August 2019. As a store team leader, CW4 led a 12 to 20 person team responsible for all aspects of operating the store, including inventory management and coordinated stocking (unloading and getting inventory onto the store floor). Between September 2018 and August 2019, CW4 reported to four different district managers due to high turnover. With respect to a new store opening at the end of April 2019 in Dublin, Ohio, at a former Toys "R" Us location, CW4 said that the new store could not get the floor filled in the beginning, because there was not enough merchandise coming in. "The new store had trouble getting goods into the store."

E. **Defendants' Materially False and Misleading Statements**

**1. The March 26, 2019 Misstatements and Omissions**

82. On March 26, 2019, Ollie's reported an increase in comparable store sales for 4Q2018 of 5.4% on top of a 4.4% increase in the prior year. After issuing the Company's financial results for the 4Q2018, Ollie's issued guidance for FY2019 as follows:

- Comparable store sales growth of 1.0% to 2.0%;
- Total net sales of $1.436 billion to $1.449 billion;
- The opening of 42 to 44 new stores, with no planned relocations or closures;
- Operating income of $189.0 million to $193.0 million;
- Adjusted net income of $140.0 million to $144.0 million; and
- Adjusted net income per diluted share of $2.10 to $2.15.

83. That same day, Defendants held an earnings call with analysts to discuss Ollie's 4Q2018 results. On the call, Defendant Butler touted Ollie's "full" inventory pipeline – omitting any mention of the inventory issues the Company was experiencing, stating instead that the Company was "getting great deals from new and existing vendors":

Year-after-year, we deliver against our long-term goals. Key to this success is our

focus on 3 strategic drivers: offering amazing deals, growing our store base and leveraging and expanding Ollie's Army. It's always been about the deal and that will never change. What has me really pumped is the continuation of the great closeout environment and our confidence that we're better positioned than anyone else to take advantage of it. ***Our pipeline is full, and we're getting great deals from new and existing vendors.*** Our recipe for success is offering great deals and believe me, in 2019, we'll have plenty of Good Stuff Cheap for our customers.

Our store growth strategy works hand-in-hand with our merchandising strategy. The more we grow our store base, the greater the opportunities for even more great deals. ***At the same time, our deal flow is so strong that we can very easily support our expansion plans for the foreseeable future.*** New stores are, in fact, the biggest driver of our growth….

We feel great about our incredible offering, strong deal flow and new stores. (Emphasis added).

84. On the March 26th call, Defendants also fielded questions from analysts, including Matthew Robert Boss from J.P. Morgan, who inquired about a "strong closeout pipeline" that Defendant Butler had previously mentioned. In response, Butler emphatically affirmed his "100% confidence" in Ollie's inventory pipeline, noting that "[t]he deals have been flying" and that he had "never seen it better":

Yes, we're really, really confident. ***I mean, we are really, really locked and loaded. The deals have been flying. I absolutely and speaking in 100% confidence, as I did about 2 years ago, that I've never seen it better.*** It continues. We are ready for the spring selling season, just need a little break on this weather. But I got all the confidence we're ready to roll. (Emphasis added).

85. On the same call, analyst Judah C. Frommer from Credit Suisse specifically asked about the quality of Ollie's inventory:

I'm not sure if you guys have seen some press recently picking at inventory growth and specifically, quality of inventory over time.…

Is there anything you'd call out beyond the store growth, beyond the timing of deals? Is there anything for tariffs, kind of forward purchasing of inventory in there? . . . And how do you feel in general about your inventory position?

86. Defendant Stasz responded by assuring analysts that Defendants had observed "really nothing material that would cause a swing in inventory":

We don't have any concerns with the inventory valuation, right? We've seen some

> articles about that, and it's just not accurate. ***The way we value our inventory and look at it and assess it on a weekly basis,*** all that stuff gets recorded in the gross margin. We did bring in some air conditioners and things early that we've talked about to try to avoid the tariffs, ***but really nothing material that would cause a swing in the inventory***. (Emphasis added).

87. Later on in the call, a BofA Merrill Lynch analyst, Jason Daniel Haas, asked about the sourcing environment and sources for Ollie's inventory availability. In response, Defendant Butler explained that "there has just been a wealth of product available" and that Ollie's was "appropriately overbought":

> Well, I think that it's our increased capacity and ability to be able to buy bigger and better deals and the visibility and notoriety that's really, really driving it. I think that whether it'd be in the CPG companies or any of the hard goods manufacturers, ***there just has been a wealth of product available and we are appropriately overbought***. I like it. I'd buy more, and we just have to keep beating the bushes and attending all the trade shows. But I just -- I think that we're just set up to take advantage of all of the situations. (Emphasis added).

88. The statements made on March 26, 2019, and discussed in ¶¶82-87, were materially false and misleading when made because: (1) Defendants failed to disclose that Ollie's was suffering from supply chain issues, inventory shortages, and a mix of lower-margin inventory since the end of 2018; (2) Defendants knew that the Company was suffering from inefficiencies at Ollie's Distribution Centers that resulted in, among other things, the inability to get needed inventory from the Company's Distribution Centers to its stores; (3) Ollie's lacked sufficient inventory to meet demand at new store locations; (4) inventory was being diverted from existing stores to new stores; (5) Defendants knew that Ollie's comparable store sales would be negatively impacted by the various inventory issues the Company was experiencing; and (6) as of result of all of these reasons, there was no reasonable basis for Defendants' FY2019 guidance.

### 2. The June 6, 2019 Misstatements and Omissions

89. On June 6, 2019, Ollie's issued a press release reporting positive results for 1Q2019, including a comparable store sales increase of 0.8% on top of a 1.9% increase in the prior year. This was Ollie's 20th straight quarter of comparable store sales growth.

90. On the same day, Ollie's also raised its sales and earnings guidance for the full-year fiscal 2019:

> **Fiscal 2019 Outlook**
>
> The Company is raising sales and earnings guidance for the full-year fiscal 2019 to reflect its first quarter results, now estimating the following:
>
> - comparable store sales growth of 1.0% to 2.0%;
> - total net sales of $1.440 billion to $1.453 billion;
> - the opening of 42 to 44 new stores, with no planned relocations or closures;
> - adjusted operating income of $190.0 million to $194.0 million;
> - adjusted net income of $142.0 million to $145.0 million and adjusted net income per diluted share of $2.13 to $2.17, both of which exclude excess tax benefits related to stock-based compensation; and
> - capital expenditures of $75.0 million to $80.0 million.

91. In the June 6, 2019 press release, Defendant Butler emphasized Ollie's continued comparable store sales growth and claimed the "deal flow [w]as as strong as ever":

> We are very pleased with our strong start to 2019. ***Exceptional new store performance and outstanding deal flow, combined with consistent margins and tight expense control, all contributed to our solid earnings growth in the quarter.*** This was our 20th consecutive quarter of positive comparable store sales, with broad-based strength across our merchandise categories. ***New stores continue to fuel double-digit sales growth, demonstrating the strength of our business model.*** 'Good Stuff Cheap' is the founding principle of our business, and with our deal flow as strong as ever we believe we are well-positioned to continue delivering great bargains to our customers and long-term growth to our shareholders. (Emphasis added).

92. The Company also held a conference call with analysts on June 6, 2019 to discuss 1Q2019 results, wherein Defendants reiterated the upward revision of the previously issued FY2019 guidance.

> Turning to our outlook. We are raising our full year guidance to reflect first quarter results. While we believe the first quarter was strong, we remain prudent on how we plan the business given that we operate in a deal-driven environment

> and we are lapping a very strong year. As we said last quarter, our plans are in line with our long-term annual targets of mid-teen unit growth and a 1% to 2% comp stores sales increase, which drives adjusted net income growth of approximately 20%.
>
> We now expect total net sales of $1.440 billion to $1.453 billion, an increase of 16.5% at the midpoint of the range; comparable store sales growth of 1% to 2%; the opening of 42 to 44 new stores with no planned relocations or closures; adjusted operating income of $190 million to $194 million; adjusted net income of $142 million to $145 million and adjusted net income per diluted share of $2.13 to $2.17, both of which exclude the tax benefits related to stock-based compensation and the after-tax gain from the insurance settlement.

93. When asked whether Ollie's margins were an issue, Defendant Stasz stated that nothing had changed since the prior quarter:

> **Bradley Bingham Thomas, KeyBanc Capital Markets Inc., Research Division - Director and Equity Research Analyst:**
>
> Got you. And then, Jay, I think, you talked about gross margin being down in 2Q. You're picking that up in the back half of the year. What's driving that pressure in 2Q, and what's changed versus the way you had forecast the quarters originally?
>
> **Defendant Stasz:**
>
> Nothing has really changed. It's just kind of actualizing Q1 and our model with our actual product mix and our actual costs on supply chain. It's just kind of refining that and cleaning it up, actualizing it and just there is a little bit of shift in cadence, ***but no major call outs to it.*** (Emphasis added).

94. Defendant Butler similarly assuaged any concerns over Ollie's margins:

> Certainly, over the last few years, in particular…we made great strides in CPG and the consumables within our organization, and we're careful not to let that upset our cake mix because the consumables we certainly operate on a lower gross margin than we do on hard goods closeouts. ***But we don't see any slowdown. Our phone keeps ringing. The deals are -- have been very, very plentiful. And we are -- as I've said the last call and previous, were appropriately overbought***. I love it. (Emphasis added).

95. In response to a question from J.P. Morgan analyst Matthew Robert Boss regarding which categories of merchandise exceeded or missed Ollie's internal plan, Defendant Butler blamed bad weather as the reason for any slowdown during the quarter, and reiterated the "great deals the Company was getting":

> HBA, electronics and toys. Toys -- so that everybody doesn't get wound up, toys just isn't a very, very big mover for us in the quarter, but we did very well compared to last year. So we really have been doing very well in floor covering. ***We've got a lot of great deals and a lot of great product. So I would say that is the most exciting thing that we have going on right now***. . . . ***The weather has not been favorable. I'm not -- we're not the only retailer in America that's saying that. But anything that we feel is going to be corrected with a little bit of warm weather, and we're locked and we're loaded in warm weather and seasonal products which are performing well.*** Air conditioners with a warm night are really going to kick in. We got plenty of them. ***We got great buys. We've been buying them all year long. So I'm excited about that***. In our lawn and garden and our patio, we're locked and loaded. And any kind of real pop that we were expecting in Q1, we're expecting to come in Q2 . . . . (Emphasis added).

96. Commenting on the Company's successful expansion, Defendant Swygert represented on the call that new store performance was not negatively impacting existing Ollie's stores:

> I think, Matt, from our perspective as well, obviously the new stores are performing very strong, as Jay said. But the reverse waterfall impact – ***and we're still able to deliver the positive comps in 20 quarters in a row. So we're very excited about being able to grow as rapidly as we're growing and continuing to deliver these comp store sales.*** (Emphasis added).

97. While blaming the weather for its impact on seasonal business at comparable stores, Defendant Butler similarly touted the Company's expansion efforts and new store sales as reasons for the Company's continued growth:

> We saw broad-based strength across our merchandise categories with over half of our departments comping positive. Our best-performing categories included floor coverings, health and beauty aids, electronics and toys. ***Tough weather in many of our markets impacted our seasonal business***, but were able to deliver better than top lines sales as our new stores crushed it. . . .
>
> The bigger we get, the greater the opportunities for us to land even more great deals to support even more stores. This will absolutely be the fuel for our continued growth. ***New stores once again performed above our expectations in the quarter, further demonstrating the strength of our model.*** We've been busy. So far this year, we've opened 24 stores, including 12 former Toys "R" Us locations. We expect the new stores to continue to be a significant driver of our growth as we see great opportunities to expand the Ollie's footprint with successful new stores in existing and new markets. (Emphasis added).

98. Defendant Stasz also commented on the success of Ollie's new store openings,

also noting the purported weather-related issues experienced during the quarter:

> As Mark mentioned, ***we did see some weather-related headwinds throughout the quarter***, but by managing elements within our control, we delivered strong results. During the quarter we opened 21 new stores ending with 324 stores in 23 states, an increase in store count of 17.4% year-over-year. ***Our new stores continued to perform above our expectations across both new and existing markets, and we are very pleased with the productivity of our entire store base***. (Emphasis added).

99. Later in the call, Citigroup MD and Senior Analyst Paul Lawrence Lejuez asked whether Ollie's "maybe [] missed some sales opportunity" in the first quarter of 2019. Defendant Butler responded, again pointing to weather conditions as the cause for any slowdown during the first quarter:

> ***Yes. I don't think that I worry at all about any of the inventory levels***. I think that I get excited about the inventory levels. . . . ***I think that the seasonal business performed just fine in Q1. We would have expected it to be better if we would have had better weather. There was a lot of noise in Q1 that we couldn't – we weren't involved in. That was the weather. It was a later Easter. There is all the noise about the tax refunds and everything. So I was just thrilled with our performance, and we're locked and loaded and just need some sunshine, some hot weather.*** And I feel good about where we're at. (Emphasis added).

100. The statements made on June 6, 2019, and discussed in ¶¶ 89-99, were materially false and misleading when made because: (1) Defendants failed to disclose that Ollie's was suffering from supply chain issues, inventory shortages, and a mix of lower margin inventory since the end of 2018; (2) Defendants knew that the Company was suffering from inefficiencies at its Distribution Centers that resulted in, among other things, the inability to get needed inventory from the Company's Distribution Centers to its stores; (3) Ollie's lacked sufficient inventory to meet demand at new store locations; (4) inventory was being diverted from existing stores to new stores; (5) Defendants knew that Ollie's comparable store sales would be negatively impacted by the various inventory issues the Company was experiencing; and (6) as of result of all of these reasons, there was no reasonable basis for Defendants' FY2019 guidance.

### F. Ollie's Discloses that Significant Inventory Supply Chain Issues and a Low-Margin Inventory Mix Caused Comparable Store Sales to Decline for the First Time in Five Years

101. On August 28, 2019, Ollie's shocked the market by announcing disappointing 2Q2019 financial results and lowering its previously issued FY2019 earnings guidance. Ollie's disclosed that comparable store sales – the key financial metric for Ollie's investors – had decreased ***for the first time in five years*** because of supply chain issues caused, in part, by the Company's expansion efforts. Ollie's also announced that net income, adjusted net income, and EBITDA had fallen:

**Second Quarter Summary:**

- ***Comparable store sales decreased 1.7% from a 4.4% increase in the prior year.***
- Net income decreased 15.7% to $25.2 million and net income per diluted share decreased 15.6% to $0.38.
- Adjusted net income decreased 9.9% to $23.5 million and adjusted net income per diluted share decreased 12.5% to $0.35.
- Adjusted EBITDA decreased 6.8% to $37.5 million.

102. Defendant Butler, referencing the "tough" quarter, revealed that the Company's rapid expansion resulted in supply chain and low margin inventory issues that negatively impacted comparable store inventory and sales:

> This was certainly, by Ollie's standards, a tough quarter…. The exceptional strength, ***rapid pace of openings and larger footprint of these new stores impacted comparable store sales through increased cannibalization and supply chain pressures that reduced comparable store inventory levels.*** Comparable store sales were also affected by headwinds from store classes with exceptionally strong first-year sales now normalizing as they entered the comparable store base. ***Our gross margin in the quarter was pressured by both unfavorable merchandise margin as well as deleveraging of supply chain costs as we underestimated the impact of our accelerated new store growth on our operations***…. (Emphasis added).

103. Ollie's also significantly reduced its FY2019 earnings guidance. The Company reduced FY2019 comparable sales to a range of 0.5% to 1.5% (from anticipated growth of 1.0%

to 2.0%); cut total net sales to $1.419 billion to $1.430 billion (from $1.440 billion to $1.455 billion); cut operating income to 174 million to $178 million (from $190 million to $194 million); and cut adjusted net income to 130 million to $133 million (from $142 million to $145 million).

104. During a conference call held the same day to discuss the financial results, Defendant Swygert disclosed that a "bottleneck issue" had existed in the supply chain "for most all of Q2" and was not corrected until "the last week of the quarter." Swygert stated, in relevant part:

> I'll take the first part with regards to the impact with supply chain in the quarter. We obviously had mentioned, we underestimated the impact of the new store openings and the cadence of the openings and the pressure they put on the supply chain. ***What happened was that is we got behind the 8-ball on the supply chain front and we're not able to get as much inventory out of the boxes as we needed to and the comps for inventory suffered because of that*, *that existed for most all of Q2 and was corrected basically in the last week of the quarter***. So, that definitely impacted our sales and our ability to get the inventory out of the distribution centers into the stores and at some level impacted our ability to get the goods into the distribution centers out to the stores as well. ***So, there was definitely a bottleneck issue we had in dealing with supply chain***…. (Emphasis added.)

105. While Defendant Swygert acknowledged that the inventory "bottleneck" had "existed for most all of Q2" – which started on May 5, 2019 – former Ollie's employees explained that the supply chain issues were present since the 4Q2018 and 1Q2019. *See* ¶¶ 51-81.

106. On a conference call with analysts on August 28, 2019, Defendant Butler expanded on the reasons for the disappointing quarter and lowered guidance:

> We saw a bigger-than-expected impact on comp stores sales from cannibalization and the recent classes of new stores as they entered the comp base. First, new stores opened since late last year included the former Toys R Us locations have cannibalized sales from stores in existing markets at a higher-than-historical rate. The Toys R Us stores, in particular, are larger boxes and in great locations, many within an existing market.
>
> Secondly, the 2017 and 2018 new stores classes entering the comp base had a higher-than-normal impact on comparable store sales as these stores' performance

> exceeded 100% productivity in their first year. The 29 stores that we opened in the first half of the year was an all-time high for us**.** ***We underestimated the demand of initial inventory investment and replenishment for these new stores***. ***This resulted in reduced inventory levels for our comp stores throughout much of the period***. . . .
>
> ***Moving on to gross margin, which was impacted by an increase in supply chain expenses and reduced merchandise margin.*** Supply chain expenses deleveraged as we needed to boost labor to support the outsized inventory requirements for the new store, their larger square footage and the velocity of replenishment post grand opening due to their strong performance. (Emphasis added).

107. In response to a question from J.P. Morgan analyst Matthew Robert Boss, Defendant Butler admitted that the inventory problems were something that could have been addressed earlier:

> And I think the real – ***the supply chain, Matt, is something that we could have and should have been able to get a little bit ahead of. We didn't anticipate that properly.*** (Emphasis added).

108. Defendant Butler also acknowledged that inventory quality had been an issue:

> [T]he margin miss was timing, was cherry-picking, was weather, ***was the amount of deals that we had that were offered to us at lower margin….The timing of the deals and the margin profile of the products that we bought -- that was presented to us, was lower IMU. Once again, we still agreed to buy it and get it to the stores than it were lower margin goods***. (Emphasis added).

109. On this news, Ollie's shares plummeted $21.41 per share – nearly 30% – to close at $56.36 per share on August 29, 2019, on unusually high trading volume.

110. Analysts were surprised by the August 28, 2019 disclosures. *See* August 28, 2019 Wells Fargo Report ("OLLI reported a surprising bad quarter, as a litany of internal and external issues resulted in a material earnings disappointment"); August 29, 2019 RBC Capital Markets Report (". . .this quarter was a big disappointment. We remain on the sidelines for now"); August 29, 2019 J.P. Morgan Report (lowering price target); and August 29, 2019 Quo Vadis Capital Report ("we remain sellers of OLLI post 2QFY19").

111. News commentators were also surprised. An August 29, 2019 *Investor's Business Daily* report described the "terrible report from Ollie's Bargain Outlet" as holding "generally

disappointing second-quarter results" such that the Company "guided lower for the rest of the year." The report noted that Ollie's "stock plunged 27.5%."

112. An August 29, 2019 article in *The Street* reported that Ollie's shares "were getting thrashed Thursday after the company posted worse-than-expected earnings and lowered its forecasts for the year."

113. Likewise, on September 24, 2019, after hosting a day of meetings with Defendants Butler, Swygert, and Stasz, Piper Jaffray reported that "OLLI didn't have enough labor at the DC's (particularly the northeast DC) to manage the increased flow of product to stores. This in turn caused out-of-stock issues at stores (-1.5% to -2% comp impact in Q2) and increased payroll costs at DC for overtime (-40 bps to GM in Q2)."

114. A later analyst report shed more light on the causes of Ollie's surprisingly bad 2Q2019. On October 15, 2019, RBC Capital Markets issued a stating, in pertinent part:

> [Ollie's] supply chain struggled to keep up with the increase in new store openings and total sales volumes from the bigger TRU stores….[T]he company significantly accelerated the cadence of new store openings in 1H (up nearly 18% YOY) and since the TRU stores are about 20% larger, we estimate square footage increased by over 20%. This rapid expansion in capacity had 2 other negative effects. (1) First, the company's supply chain wasn't able to accommodate the incremental sales volume flowing through their DC and store networks. This resulted in lower in-stock levels than what the company normally operates at in their existing store base, as inventory was routed to the new locations to support their grand opening events. The resulting higher-than-normal out-of-stock levels was estimated to have impacted sales by another 150-200 bps/$5mm….(2) Second, the natural reaction of the company was to throw additional labor at the situation to try to improve the inventory flow, resulting in an additional ~40 bps of GM pressure….A mess indeed.

115. The reverse in Ollie's comparable store sales continued in the 3Q2019 when, on December 12, 2019, the Company reported a decrease of 1.4% in comparable store sales compared to a 4.6% increase in the prior year.

G. **Additional Allegations Regarding Materiality**

116. There is a substantial likelihood that that a reasonable shareholder would consider Defendants' misstatements and omissions concerning the inventory issues the Company was

experiencing important because it altered the total mix of information made available. Various factors indicate the materiality of these omissions.

117. ***Defendants' misstatements and omissions about Ollie's inventory issues caused adverse effects on the Company's financial results of over 5%, which supports a finding of materiality.*** An August 29, 2019 Motley Fool article entitled *Here's Why Ollie's Bargain Outlet Stock Is Getting Crushed After Earnings* reported that "[t]he weight of lower sales growth expectations—in particular that comps will shrink, reducing the operating leverage its existing stores generate—will take a bite out of earnings, too. Ollie's operating income and net income guidance were both lowered 8% from the prior guidance."

118. ***Ollie's core business is the sale of goods and its main asset is its inventory, which accounts for 70% of tangible assets.*** Defendants' misstatements and omissions about Ollie's inventory related to the heart of the Company's business and played a significant role in operations and profitability.

119. ***Ollie's misstatements and omissions masked a change in earnings and other trends.*** On August 28, 2019, The Buckingham Research Group noted that earnings per share fell 24% short of consensus. Similarly, the Motley Fool reported on August 29, 2019 that comparable store sales were forecasted "to fall between 0.5% and 1.5% for the full year" when "[o]riginally, the company was looking to grow comps 1%-2%."

120. ***Ollie's stock price experienced extreme volatility and plunged roughly 27% during the after-market trading session on August 28.*** The before and after is here depicted:



121. ***Ollie's misstatements and omissions ultimately hid a failure to meet analysts' consensus expectations***. As Buckingham Research Group stated in an August 28, 2019 report, Ollie's "2Q19 [was] massively disappointing across the board"; "EPS [fell] 24% short of consensus"; and "comparable store sales turn[ed] negative and were 360 basis points below estimates." An August 29, 2019 report by Quo Vadis Capital charted the significance of these misses:






H. **Additional Scienter/Falsity Allegations**

122. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Ollie's, their control over and/or receipt and/or modification of Ollie's allegedly materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning Ollie's, participated in the fraudulent scheme alleged herein.

123. ***Defendant Stasz expressly stated that Ollie's executives assess inventory on a weekly basis.*** On a March 26, 2019 conference call, Defendant Stasz represented that "[t]he way we value our inventory and look at it and assess it ***on a weekly basis***, all that stuff gets recorded in the gross margin."

124. ***Former Ollie's employees reported that Ollie's executives had electronic access to detailed and current sales and inventory data***. *See* ¶ 56 (CW1 reported that Ollie's executives, including Butler and Swygert, had access to such data). *See also* ¶ 62 (CW2 stated that sales numbers by store were published to all Ollie's managers (and those higher than managers) in the Daily Sales Flash Report, so that everyone, including the executives, can see whether the stores are doing well or poorly).

125. ***Two Former Ollie's employees reported that Ollie's new store opening inventories dropped by 25% in 1Q2019***. *See* ¶¶ 54-55, 76. An inventory change of this magnitude supports a finding of scienter.

126. ***Former Ollie's employees reported that Swygert scrutinized inventory issues.*** *See* ¶¶ 71-72 (CW2 stated that Defendant Swygert was hands-on with respect to the Company's finances, inventory control, and all other aspects of the operations).

127. ***A former Ollie's employee reported that Ollie's Distribution Centers were inefficient during the Class Period.*** For example, CW2 said that it was well known within Ollie's, both at the Distribution Centers and at corporate headquarters, that the standards Ollie's used to measure efficiency at the Company's Distribution Centers were not accurate. "[M]any people in the organization…suggested to have the standard truly measured." "It was suggested to VP of Logistics Jeff Glass, it was suggested to SVP Logistics Ray Daugherty, it was suggested to COO John Swygert, to…Mark Butler. Everybody knew about it, but nobody did anything about it." CW2 spoke with CW2's superiors, and they with their superiors, about the problem many times over CW2's 16-month tenure. "Everyone acknowledged [the standards] were inaccurate." *See* ¶¶ 66-69.

128. ***Defendant Swygert admitted that the inventory problems "existed for most all of Q2."*** On the August 28, 2019 earnings call, Defendant Swygert stated that the "bottleneck issue we had in dealing with [the] supply chain" had "existed for most all of Q2" – which began on May 5, 2019.

129. ***Ollie's senior executive team, comprised of Defendants Butler, Swygert, and Stasz, was tight-knit and hands-on.*** As set forth above, the trio participated in all relevant earnings calls together and attended other investor events as a team. CEO Mark Butler founded Ollie's in 1982 and in recent years had been grooming Swygert to take over "as part of the succession planning process." Swygert had been with the Company for over 15 years, first as CFO from March 2004 and then as COO from January 2018, before taking over as CEO in December of 2019. Stasz was Ollie's Chief Accounting Officer until he took over as CFO from Swygert in January 2018.

130. ***Defendant Butler was known for creating a hands-on management culture at Ollie's.*** "From ringing the first sale in the first Ollie's store in Mechanicsburg, Pa. in 1982," to attending "every one of Ollie's first 104 openings," Butler was intricately involved in all aspects of the business. Swygert is said to have a "passion for the Ollie's culture" developed by Butler, which analysts also describe as "home-grown / closely knit." This hands-on and tight-knit

Company culture creates the inference that Ollie's senior executive team knew of the critical inventory and supply chain issues the Company was experiencing during the Class Period.

131. ***Ollie's core business is the sale of goods and its main asset is its inventory***. As stated in Ollie's 2018 Form 10-K, as of February 18, 2018, and exclusive of intangibles, Ollie's "inventory balance represented 70.7% of [its] total assets." As set forth above, the sale of inventory is Ollie's business. This creates the inference that Ollie's senior executive team knew of the critical inventory and supply chain issues the Company was experiencing.

132. ***Ollie's touted its supply chain management as a primary skill of the Company's senior executive team.*** As Ollie's stated in its 2019 Form 10-K: "Efficient inventory management is a key component of our profitability and ability to generate revenue. To be successful, we must maintain sufficient inventory levels…." Among its "competitive strengths," Ollie's lists its "[h]ighly experienced and passionate founder-led management team," and explains that these "senior executives possessive extensive experience" with "supply chain management." *See id*. This creates the inference that Ollie's senior executive team knew of the critical inventory and supply chain issues the Company was experiencing.

133. ***Ollie's had technology in place to provide real time information to its senior executive team regarding its inventory.*** In addition to the Daily Flash Reports and Defendant Stasz's statement that Ollie's checked inventory "weekly," Ollie's stated in its 2019 10-K that the Company's "management information systems provide a full range of business process assistance and timely information" to support "management of multiple Distribution Centers, stores and operations." *See id.* As Ollie's states in its annual reports: "We believe our current systems provide us with … management control and timely reporting that allow us to identify and respond to merchandising and operating trends in our business." *See id*. This further supports an inference that Ollie's senior executive team knew of the adverse inventory and supply chain issues the Company was experiencing.

134. ***Ollie's did not want to end its winning streak, so it took the ultimately failed gamble that it could correct the inventory and supply chain issues before they had to be***

***disclosed.*** As reported in various articles, after gaining "50.89% in 2019", Ollie's did not want to disclose the inventory and supply chain issues affecting the Company's comparable store sales because Ollie's stock movement would mostly depend on management's discussion of business conditions on the earnings call. After the June 6, 2019 call, an article by Dave Butler entitled *Ollie's Bargain Outlet Has Shown Great Performance, But It's a Little Pricey* stated that Ollie's continued to be described as "one of the best-performing names in brick and mortar" with guidance that "exceeds many forecasts for other retailers." Defendants were motivated to commit fraud to keep its 20-quarter comparable store sales increase going.

135. ***Defendant Stasz was also motivated to commit fraud to unload over half of his Ollie's shares at artificially inflated prices.*** On April 24, 2019, one month after the beginning of the Class Period, Defendant Stasz sold over half of his Ollie's stock (12,500 shares at $95 per share) at artificially inflated prices, for proceeds of approximately $1.2 million. Defendant Stasz's sale transaction was unusual and suspicious in terms of timing and scope. From October 2018 through March 2019, a period comparable in length to the Class Period, Defendant Stasz made no sales of his Ollie's stock.

## I. Presumption of Reliance: Fraud on the Market

136. At all relevant times, the market for Ollie's securities was efficient for the following reasons, among others: (1) the securities were listed and actively traded on the NASDAQ, a highly efficient and automated market; (2) as an issuer, Ollie's filed periodic public reports on Form 10-K and Form 10-Q with the SEC; (3) Ollie's regularly issued press releases that were carried by the national news wires, were publicly available, and entered the public marketplace; and (4) Ollie's was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

137. As a result, the market for Ollie's securities promptly digested current information regarding Ollie's from all publicly available sources and reflected such information in Ollie's

share price.

138. Under these circumstances, all purchasers of Ollie's securities during the Class Period suffered similar injury through their purchase of Ollie's securities at artificially inflated prices and a presumption of reliance applies.

J. **Loss Causation / Economic Loss**

139. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Ollie's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Ollie's business, operations, and prospects as alleged herein.

140. During the Class Period, as detailed herein, Ollie's securities were artificially inflated due to Defendants' misleading statements and omissions. When Defendants' prior misrepresentations and omissions were disclosed and became apparent to the market, the price of Ollie's securities fell as the prior artificial inflation came out.

141. As a result of their purchases of Ollie's securities during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the securities laws.

142. The decline in the price of Ollie's securities after the corrective disclosure on August 28, 2019, was a direct result of Defendants' misrepresentations being revealed to investors and the market.

143. The decline in the price of Ollie's securities was also the result of the materialization of the concealed investment risks concerning Ollie's.

144. Defendants' materially false and misleading statements relate to the Company's successful expansion efforts, comparable store sales, inventory pipeline and FY2019 earnings estimates, sales, and growth.

145. The corrective disclosure on August 28, 2019, revealed that (1) Ollie's previously-

issued statements on March 26, 2019 and June 6, 2019 as well as the Company's FY2019 guidance had no reasonable basis; and (2) comparable store sales decreased as a result of supply chain issues, aggressive new store openings, and a glut of low-margin inventory.

146. After these disclosures, on August 29, 2019, Ollie's shares fell $21.41 per share or nearly 27%, to close at $56.36 per share.

147. Analysts' statements after the August 28, 2019 disclosure show the importance of Defendants' revelations about inventory issues and comparable store sales growth. On August 28, 2019, Seeking Alpha reported that Ollie's was "on watch after Q2 EPS misses even the lowest estimate turned in by analysts for a quarter when comparable sales turned lower by 1.7%."; Buckingham Research Group stated that the "comparable store sales of negative 1.7% [were] well below the Street 1.9% expectation"; and RBC Capital Markets reported that "2Q comps/results [were] well below expectations" and "well short of our/consensus" with the quarter "a big disappointment."

148. Wells Fargo likewise stated that "OLLI reported a surprisingly bad quarter" with a "material earnings disappointment." "Comps declined for the first time in the company's public history (down 1.7% versus consensus of a 1.9% gain)," and Ollie's "EPS of $0.35 fell well short of both consensus and our estimate of $0.46."

149. MarketWatch reported that Ollie's stock "plunge[d] more than 25% as earnings miss" and Ollie's "slashed its prediction for same-store sales growth to a decrease of 0.5% to 1.5%, after previously guiding for growth of 1% to 2%."

150. On August 28, 2019, Zacks Equity Research reported that "OLLI plunged roughly 28% during the after-market trading session on Aug 28" following the company's "lower-than-expected second-quarter fiscal 2019 results." The quarterly earnings of $0.35 per share "fell sharply," "miss[ed] the Zacks Consensus Estimate of $0.46 per share," and represented "an earnings surprise of -23.91%." On the next day, August 29, 2019, Zacks Equity Research reported that the "company witnessed dismal comparable-store sales performance." "Gross margin shriveled 190 basis points to 37.2%" and "operating margin shrunk 290 basis points to

9.2%."

151. Investor's Business Daily reported on August 28 and 29, 2019 that Ollie's shares "collapsed after it posted dreadful results and tugged its outlook lower[,]" that Ollie's "stock crashed" when comps "unexpectedly fell" and that the Company's earning per share, which was "expected to climb 15% to 46 cents," instead "fell to 35 cents a share."

152. As Motley Fool put it, "investors seemed surprised and displeased that same-store sales and earnings per share (EPS) fell, seemingly changing Ollie's from a high-flying growth stock to a turnaround story overnight."

153. The timing and magnitude of the price decline in Ollie's securities negate any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' statements. The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' misstatements and omissions and the subsequent significant decline in the value of Ollie's securities when Defendants' misrepresentations were revealed.

## II. CLASS ACTION ALLEGATIONS

154. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Ollie's securities between March 26, 2019 and August 28, 2019, inclusive, and who were damaged thereby (the Class). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

155. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Ollie's common shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are

at least hundreds or thousands of members in the proposed Class. Millions of shares of Ollie's common stock were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Ollie's or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

156. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

157. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

158. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Ollie's; and

(c) to what extent the members of the Class have sustained damages, and the proper measure of damages.

159. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against all Defendants

160. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

161. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase Ollie's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each Defendant, took the actions set forth herein.

162. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Ollie's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

163. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Ollie's financial well-being and prospects, as specified herein.

164. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Ollie's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state

material facts necessary in order to make the statements made about Ollie's and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

165. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

166. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Thus, Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing material problems with Ollie's business and financial results from the investing public and supporting the artificially inflated price of its securities.

167. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Ollie's securities was artificially inflated during the Class Period. In ignorance of the fact that

market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired Ollie's securities during the Class Period at artificially high prices and were damaged thereby.

168. At the time of said misrepresentations and/or omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Ollie's was experiencing, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Ollie's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

169. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

170. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II
## Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

171. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

172. Individual Defendants acted as controlling persons of Ollie's within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with

the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

173. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

174. As set forth above, Ollie's and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

(A) Determining that this action is a proper class action and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(B) Awarding damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the Securities Exchange Act of 1934, in an amount to be proven at trial, including interest thereon;

(C) Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(D) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Lead Plaintiffs hereby demand a trial by jury.

DATED: February 25, 2020

Respectfully submitted,

**BERNSTEIN LIEBHARD LLP**

By: /s/ Joseph R. Seidman, Jr.

Stanley D. Bernstein
Stephanie M. Beige
Joseph R. Seidman, Jr.
Lisa Sriken
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
bernstein@bernlieb.com
beige@bernlieb.com
seidman@bernlieb.com
sriken@bernlieb.com

*Co-Lead Counsel for Lead Plaintiffs and the Proposed Class*

**HAGENS BERMAN SOBOL SHAPIRO LLP**

Reed R. Kathrein
Lucas E. Gilmore
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Steve W. Berman
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Co-Lead Counsel for Lead Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that February 25, 2020 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

*/s/ Stephanie M. Beige*
STEPHANIE M. BEIGE