UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────────

BERNARD L. MALONEY III and
NATHAN SEVERE, *individually and on
behalf of all others similarly situated*,
                                   Plaintiffs,

                   -v-

OLLIE'S BARGAIN OUTLET
HOLDINGS, INC., et al.,
                                   Defendants.

19-CV-8647 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

      Bernard L. Maloney III and Nathan Severe, individually and on behalf of all others similarly situated, bring suit against Ollie's Bargain Outlet Holdings, Inc. ("Ollie's") and three of its senior executives, alleging violations of the Securities Exchange Act of 1934. Ollie's and its executives have moved to dismiss the complaint for failure to state a claim. For the reasons that follow, their motion is granted.

**I.    Background**

      The following facts, drawn from the amended complaint, are presumed true for the purposes of this motion. (*See* Dkt. No. 47 ("AC").)

      Ollie's is a nationwide chain of bargain retail stores. (AC ¶ 2.) After going public in 2015, the company "embarked on an aggressive expansion campaign," growing from 176 stores in 2014 to 324 stores in 2019. (AC ¶ 3.) Initially, investors and analysts worried that Ollie's expansion would create inventory problems for the company, negatively impacting sales. (AC ¶ 4.) From 2015 through early 2019, however, Ollie's consistently reported strong sales numbers, assuaging many of these concerns. (*Id.*)

This case concerns the period beginning March 26, 2019. On that date, Ollie's released positive financial results for the fourth quarter of 2018, reporting a 5.4 percent increase in comparable store sales, a measure of how stores are performing relative to how they performed over a similar period in the past. (AC ¶ 5.) Ollie's also issued guidance for fiscal year 2019, projecting, among other things, a one- to two-percent increase in comparable store sales; total net sales of roughly $1.4 billion; and the opening of more than 40 new stores, with no planned closures. (AC ¶ 82.) On an earnings call with analysts that same day, Ollie's CEO Mark Butler expressed confidence in the company's growth, explaining that Ollie's "deal flow" was "so strong" that the company could "very easily support [its] expansion plans for the foreseeable future." (AC ¶ 83.) In response to questions about the inventory pipeline, Butler and Jay Stasz, Ollie's chief financial officer, assured analysts that the company was "really, really locked and loaded" and that they had seen "really nothing material that would cause a swing in the inventory." (AC ¶¶ 84, 86.)

On June 6, 2019, Ollie's issued a press release that appeared to confirm this assessment, reporting positive results for the year's first quarter, including a 0.8 percent increase in comparable store sales. (AC ¶ 89.) The company also issued revised guidance for fiscal year 2019, raising its projections for net sales and earnings. (AC ¶ 90.) In the press release and in a conference call with analysts, company executives reaffirmed their confidence in Ollie's inventory and touted the performance of new stores, which had "performed above … expectations." (AC ¶¶ 91-99.)

Then, on August 28, 2019, Ollie's reversed course, announcing a "tough" second quarter that saw comparable store sales decrease for the first time in five years. (AC ¶¶ 101-102.) Butler attributed the disappointing results to issues with the company's supply chain and

inventory, stating that the company had "underestimated the impact of our accelerated new store growth on our operations." (AC ¶ 102.)  In a conference call held that day, John Swygert, Ollie's chief operational officer, disclosed that a "bottleneck issue" had existed in the supply chain "for most all of Q2 and was corrected basically in the last week of the quarter." (AC ¶ 104.)  On the heels of the news, Ollie's stock price plunged roughly 27 percent. (AC ¶ 120.)

On February 25, 2020, Lead Plaintiffs Nathan Severe and Bernard L. Maloney ("Plaintiffs") filed an amended complaint[1] on behalf of those who bought or otherwise acquired Ollie's securities between March 26, 2019, and August 28, 2019, alleging that Ollie's and its executives knew that their March and June statements about Ollie's inventory and comparable store sales were "false and materially misleading," and seeking remedies under the Securities Exchange Act of 1934. (AC ¶¶ 1, 13.)  According to testimony from confidential witnesses, company executives knew that Ollie's had been "suffering from significant supply chain inventory issues, as well as a glut of low-margin inventory," since at least the first quarter of 2019. (AC ¶ 13.)  Defendants — Ollie's, as well as Butler, Stasz, and Swygert (the "Individual Defendants") — have filed a motion to dismiss for failure to state a claim under Federal Rule of Procedure 12(b)(6).  (*See* Dkt. No. 52.)

## II. Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

---

[1] The initial complaint was filed on September 17, 2019.  It listed Robert Stirling, who had purchased Ollie's securities, as plaintiff, and covered a class period from June 6, 2019, to August 28, 2019.  (*See* Dkt. No. 1 ¶¶ 1, 11.)

for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

Plaintiffs alleging securities fraud claims, however, must satisfy "heightened pleading requirements" to withstand a motion to dismiss. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Under the Federal Rules of Civil Procedure, a party alleging fraud "must state with particularity the circumstances constituting" that fraud. Fed. R. Civ. P. 9(b). Likewise, the Private Securities Litigation Reform Act ("PSLRA") requires plaintiffs alleging securities fraud based on an untrue statement or omission of a material fact to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *see also Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (explaining similar requirements under Federal Rule of Civil Procedure 9(b)).

The PSLRA also contains a scienter requirement: Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." § 78u-4(b)(2)(A). "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

### III.  Discussion

Plaintiffs allege violations of Section 10(b) of the Exchange Act, Rule 10b-5, and Section 20(a) of the Act. (AC ¶ 28.)

#### A.  Claims Under Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder prohibit "mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact

4

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.  To state a claim under these provisions, a plaintiff must establish "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or a sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).

Defendants argue that Plaintiffs have failed to plead (1) an actionable omission or misstatement, (2) scienter, and (3) loss causation.  (*See* Dkt. No. 53 at 17.)  The Court begins with the second of these arguments.  If Defendants have failed to plead scienter, the Court need not proceed further.  *See, e.g.*, *City of N. Miami Beach Police Officers' and Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, No. 19-CV-10825, 2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) (dismissing Section 10(b) and Rule 10b-5 claims upon holding that scienter requirement had not been met); *Tung v. Bristol-Myers Squibb Co.*, 412 F. Supp. 3d 453, 459 (S.D.N.Y. 2019) (same).

In securities fraud cases, the requisite scienter is "an intent to deceive, manipulate, or defraud."[2] *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (internal quotations and citation omitted).  In the Second Circuit, scienter may be established by showing "either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Local 134 IBEW Joint Pension Tr. of*

---

[2] Here, the scienter inquiry for Ollie's and its senior executives is functionally the same, as corporate scienter requires proving that someone "whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

*Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (citations omitted).  The Court concludes that Plaintiffs have satisfied neither prong.

### 1.     Motive and Opportunity

To show that the Individual Defendants had the requisite motive and opportunity, Plaintiffs must allege that they "benefitted in some concrete and personal way from the purported fraud."  *Id.* at 198 (quoting *Novak*, 216 F.3d at 307-08).  "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."  *Id.* (internal citations omitted).  Instead, to demonstrate the requisite motive, Plaintiffs must typically allege that "corporate insiders … ma[de] a misrepresentation in order to sell their own shares at a profit."  *Id.* (internal citation omitted).

Plaintiffs offer two motives for the alleged fraud.  The first is that "Ollie's did not want to end its winning streak, so it took the ultimately failed gamble that it could correct the inventory and supply chain issues before they had to be disclosed."  (AC ¶ 134.)  Defendants were motivated to commit fraud, in this view, "to keep [Ollie's] 20-quarter comparable store sales increase going."  (*Id.*)  This motive is inadequate, as the desire to maintain Ollie's winning streak is no different from "the desire for the corporation to appear profitable" — which courts have repeatedly held to be insufficient.  *See ECA*, 553 F.3d at 198 (internal citations omitted); *see also Kalnit*, 264 F.3d at 139 (holding that, to show motive, "a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold" (internal citation omitted)); *Novak*, 216 F.3d at 307 (holding that plaintiffs "could not proceed based on motives possessed by virtually all corporate insiders," including the desire to "sustain the appearance of corporate profitability" (internal quotation marks and citation omitted)).

The second alleged motive concerns Stasz, Ollie's chief financial officer. According to Plaintiffs, Stasz hid Ollie's inventory issues so that he could unload his shares at artificially inflated prices. (AC ¶ 135.) Plaintiffs highlight, in particular, an April 24, 2019 sale in which Stasz sold more than half of his shares for roughly $1.2 million. (*Id.*) Yet this, too, fails to supply the requisite motive. For stock sales to reveal a fraudulent motive, they "must be unusual." *City of N. Miami Beach*, 2021 WL 212337, at *6 (internal quotation marks and citation omitted). The April sale — which was executed pursuant to a non-discretionary 10b5–1 divestment plan that Stasz entered in 2018 (*see* Dkt. No. 54–9[3]) — does not clear that bar. The fact that the transaction was mandatory, and that Stasz entered the plan well before the start of the class period, "undermines any allegation that the timing or amounts of the trades was unusual or suspicious." *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009).

In addition, if the Individual Defendants were motivated to hide inventory issues in order to sell their stock at a profit, it is unlikely that Stasz would have been the only executive to unload his shares. *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit." (internal quotation marks and citation omitted)). And, as Defendants point out, "by retaining millions — or, in the case of Mr. Butler, hundreds of millions — worth of shares,

---

[3] Although the complaint does not reference the Rule 10b5–1 plan, "when a complaint alleges only incomplete information concerning insider sales, the court is free to consider defendants' SEC filings to fill gaps on motion to dismiss." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011) (internal quotation marks and citation omitted); *see also Koplyay v. Cirrus Logic, Inc.*, No. 13-CV-790, 2013 WL 6233908, at *6 (S.D.N.Y. Dec. 2, 2013) ("[C]ourts in this Circuit have regularly made reference to Rule 10b5–1 plans when considering scienter in securities fraud actions.").

the Individual Defendants were *harmed* by the fraud they purportedly orchestrated, undermining any fraud theory." (Dkt. No. 53 at 27.)

Having "failed to allege that Defendants benefitted in some concrete and personal way from the purported fraud," Plaintiffs cannot satisfy the first prong of the scienter test. *City of N. Miami Beach*, 2021 WL 212337, at *8 (internal quotation marks and citation omitted).

### 2. Strong Circumstantial Evidence

Scienter may also be pleaded by alleging "strong circumstantial evidence of conscious misbehavior or recklessness," though in the absence of motive and opportunity, "the strength of the circumstantial allegations must be correspondingly greater." *ECA,* 553 F.3d at 198–99 (quoting *Kalnit*, 264 F.3d at 142). Conscious misbehavior refers to "deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount." *Novak*, 216 F.3d at 308 (internal citations omitted). Recklessness is harder to identify but involves "an extreme departure from the standards of ordinary care." *Kalnit*, 264 F.3d at 142 (internal citation omitted). To state a claim based on recklessness, as Plaintiffs attempt to do here,[4] the complaint must "specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements. *Novak*, 216 F.3d at 308. "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id.* at 309.

---

[4] Plaintiffs refer to "conscious misbehavior" and "recklessness" in their briefing. (*See* Dkt. No. 56 at 25.) But most, if not all, of Plaintiffs' allegations appear to conform to a recklessness theory. To the extent that Plaintiffs seek to allege deliberate illegal behavior on Stasz's part, the Court's reasoning in III.A.1 applies.

According to Plaintiffs, recklessness may be inferred from the fact that the Individual Defendants had access to certain information concerning Ollie's sales and inventory — and thus knew or should have known that "the inventory shortage was negatively affecting [comparable store sales]." (*See* Dkt. No. 56 at 26 n.14.) In particular, relying in large part on the testimony of confidential witnesses, Plaintiffs allege that Ollie's executives had access to the Daily Sales Flash Report, which tracked store sales; that Ollie's executives "assess[ed] inventory on a weekly basis"; and that the company "had technology in place to provide real-time information to its senior executive team regarding its inventory." (AC ¶¶ 123, 124, 133.)

At the outset, it is worth noting that none of the confidential witnesses cited in the complaint are alleged to have had any personal interaction with Ollie's top executives.[5] That fact, by itself, is not necessarily fatal. *See Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615-16 (S.D.N.Y. 2015) (holding that "there is no baseline requirement" of contact between confidential witnesses and defendants for the Court to credit the former's allegations). For information from a confidential witness to establish scienter, however, the complaint "must describe the nature of the CW's contact with the individual defendants that would be probative of defendants' mental state. *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 799 n.19 (S.D.N.Y. 2020); *see also Local No. 38 Int'l Bhd. Of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010) (declining to credit a confidential witness's allegations where he failed to "establish what specific contradictory information the Individual Defendants received or when they received it").

---

[5] In fact, the confidential witnesses all appear to have held relatively junior positions within the company: one worked as a district manager, one as an "outbound operations manager," one as an "assistant store opening coordinator," and one as a "store team leader." (AC ¶¶ 52, 61, 73, 81.)

9

In the absence of direct personal contact between the confidential witnesses and the Individual Defendants, Plaintiffs must demonstrate scienter by other means.

Plaintiffs attempt to do so by alleging that the Individual Defendants regularly tracked Ollie's inventory and had access to daily sales reports. Yet these allegations fail to provide "strong circumstantial evidence" of recklessness. *See ECA*, 553 F.3d at 198 (internal citations omitted). With respect to the Daily Sales Flash Report, the complaint fails to specify exactly what information was contained in the report or how said information "contradicted Defendants' public statements," as is required to show scienter. *In re Adient PLC Sec. Litig.*, No. 18-CV-9116, 2020 WL 1544018, at *28 (S.D.N.Y. Apr. 2, 2020). Even if the report did reflect a decline in inventory, it is not clear that such a decline would have undermined Ollie's overall sales projections or meant that "Ollie's inventory pipeline and deal flow were not as described." (Dkt. No. 57 at 13.) As for the allegations that Ollie's executives regularly assessed company inventory, courts have routinely dismissed similar claims as too vague to support an inference of scienter. *See Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011) (finding "vague and general averments" that executives had access to "real-time customer and sales information" insufficient to demonstrate scienter); *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 373 (S.D.N.Y. 2018) (holding that "broad allegations" that defendants had access to "expense and capital cost data" did not support an inference of scienter where plaintiffs failed to identify the specific facts contained in the data or how such facts would have contradicted defendant's statements).

Plaintiffs allege that recklessness may also be inferred from the fact that Ollie's executives were "tight-knit" and "hands-on," and therefore must have been aware "of the critical inventory and supply chain issues [Ollie's] was experiencing during the Class Period." (AC

¶¶ 126, 129, 130.)  But "simply alleging that executive defendants are closely involved in running their business is not enough to show that they had access to contrary information."  *City of N. Miami Beach* 2021 WL 212337, at *10 (internal quotation marks omitted).  Although evidence of a hands-on management style may support an inference of scienter in some cases, it is insufficient to establish scienter on its own.  *In re ITT Educ. Servs., Inc. Sec. Litig.*, 34 F. Supp. 3d 298, 308 (S.D.N.Y. 2014) (finding allegations of "hands-on" management not "independently sufficient to establish a strong inference" of scienter).

Plaintiffs' argument that scienter may be inferred from the "core operations" doctrine is similarly unavailing.  Under that doctrine, "fraudulent intent can be inferred whenever a defendant makes false or misleading statements if those statements concern the core operations of the company."  *City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v. Ryanair Holdings PLC*, No. 18-CV-10330, 2020 WL 2834857, at *4 (S.D.N.Y. June 1, 2020) (cleaned up).  Here, Plaintiffs allege that Ollie's executive team must have known that the company was facing "inventory and supply chain issues" because "Ollie's core business is the sale of goods and its main asset is its inventory."  (AC ¶ 131.)  This claim does not do enough to demonstrate fraudulent intent.  For one thing, the core operations doctrine may no longer be good law after the enactment of the PSLRA.  *City of Birmingham*, 2020 WL 2834857, at *4 (citing cases calling the doctrine "questionable" and its future "tenuous").  For another, even if it remains good law, the doctrine — like allegations of hands-on management — cannot establish scienter on its own.  *Id.* ("The doctrine at most constitutes supplemental support for alleging scienter but does not independently establish scienter." (internal quotation marks and citation omitted)).

11

In assessing whether Plaintiffs have adequately established scienter, "[t]he Court is mindful of its obligation to consider 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *City of N. Miami Beach* 2021 WL 212337, at *11 (quoting *Tellabs*, 551 U.S. at 323). But Plaintiffs' allegations fall short both individually and as a group. Plaintiffs have neither demonstrated that the Individual Defendants had the motive or opportunity to commit fraud, nor put forth any compelling evidence of conscious misbehavior or recklessness. Plaintiffs have likewise failed to plead corporate scienter, as they have not shown that anyone "whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters*, 531 F.3d at 195.

In the absence of scienter, Plaintiffs cannot state a claim under Section 10(b) or Rule 10b-5. The claims against all Defendants therefore must be dismissed.

### B. Claim Under Section 20(a)

Plaintiffs also bring claims under Section 20(a) of the Exchange Act. To state a claim under that section, a plaintiff must successfully allege a "primary violation." *See ATSI*, 493 F.3d at 108. Plaintiffs have not done so here. Since their "Section 10(b) claim — the primary violation alleged — fails as a matter of law, their claim under Section 20(a) must also be dismissed." *City of N. Miami Beach* 2021 WL 212337, at *11.

## IV.     Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.

The Clerk of Court is directed to close the motion at Docket Number 52 and to close this case.

SO ORDERED.

Dated: February 10, 2021
       New York, New York

                                                J. PAUL OETKEN
                                             United States District Judge